Good morning, ladies and gentlemen. Our first case of the morning is Agenda Number 13, Case 117687, Sharon Price, Individually et al. v. Philip Morris. Are you ready to proceed? Madam Chief Justice, and may it please the Court, my name is Jim Thompson, and along with my co-counsel Lisa Blatt, I represent the appellant, Philip Morris. When this Court entered its judgment in Price v. Morris, it was correct. And that judgment is correct today. One of the issues in this case is whether the petition for newly discovered evidence was filed timely in the Circuit Court. The statute provides that it must be filed within two years from the time of entry of the final judgment. In this case, the petition was filed more than two years from this Court's judgment, and more than two years from the issuance of the mandate of this Court's judgment. Plaintiffs would have us believe that that's of no matter, because it was filed within two years of the final entry of the Order of the Trial Court, following the dictate of this Court's judgment. But it certainly would exalt form over substance to say that Appellee was attempting to be relieved of the judgment of the Trial Court, for that was a ministerial act commanded by this Court's judgment and simply carried out or spread on the record of the Circuit Court this Court's judgment. The Circuit Court had no power to overturn this Court's judgment. And so if the operative judgment under the statute is that of this Court, which was consistent with the filing of this Court's opinion, this petition comes too late and should be dismissed. The evidence relied upon by the plaintiff to show that this Court's judgment and prize was wrong, for two things. First, the FTC's trend of the court brief in the good case. Secondly, the later FTC rescission of guidance. Of course, neither of these were in existence at the time of the trial, and therefore under traditional formulations of the motion for new trial based upon newly discovered evidence, would not support it. The Betterbox case in the Third Circuit, authored by Judge, now Justice, Alito, came to that same conclusion. Curiously, the plaintiff did not mention Betterbox in his brief, and we can see why. It was fatal to their case. This petition was not preceded with diligence. Now, in Judge Freeman's dissenting opinion in Price v. Warren, on the petition for rehearing, the issue was raised as to whether the claim of FTC no authorization was waived, and Justice Freeman, writing for himself and Justice Kilbride, opined that it was not because it was required to be considered in the interest of justice. But that, it seems to me, is a different opinion. I'm not speaking of waiver. I'm speaking of diligence. And all the cases in this court and in the appellate courts of this state and in the courts of other states hold that counsel must pursue the newly discovered evidence with diligence. The first time that the plaintiffs raised the issue of whether the FTC had or had not authorized Philip Morris to advertise their cigarettes as they did was on a petition for rehearing. This court denied the petition for rehearing without comment on that. Documents filed by the plaintiff were to show that the FTC refused to file a brief, in this case, at the request of the plaintiff. But at no time during the trial did the plaintiff solicit the views of the FTC in this case. But surely that question was important, and surely the plaintiff knew of that possibility before he raised it in the petition for rehearing. Our cases would seem to say that that is not the kind of diligence required in pursuing a motion for newly discovered evidence. Finally, let's be clear. Neither the amicus brief of the FTC in good nor the rescission by the FTC ever challenged this court's opinion or the opinion of the plurality in this court that the actions of the FTC over the years in dealing with other manufacturers implied implicit authorized Philip Morris to advertise as they did, impliedly and specifically in the words of the court. In fact, the FTC in the amicus brief in the good case distinguished this court's price opinion. It did not challenge it. It did not conclude that it was erroneous. It distinguished it. It said, good is a preemption case. Price was the case of the interpretation of state law as to whether the state would accept implicit and specific authorization. And where does this all end? Let's assume we lose. And the court orders the payment of $10 billion or more based upon interest to the plaintiffs. And the day comes when the FTC commissioners change. And they, at a later time, say, oh no, Philip Morris was correct. The Supreme Court of Illinois was correct in the plurality opinion to hold that our actions implicitly and specifically authorized the conduct of Philip Morris. Do we then get to file a motion for newly discovered evidence? And do we get to trumpet the latest FTC opinion as that evidence? And do we get our money back? Surely this is not a game of musical chairs, depending on who sits in the chairs of the FTC at any given time. We believe that on these points, the judgment of the appellate court should be reversed. And my co-counsel, Lisa Blatt, will now argue the balance of our agreement. Thank you. Thank you. Thank you, and may it please the court. My name is Lisa Blatt, and I also represent Philip Morris. This court should decline plaintiff's invitation to overrule a 10-year-old decision of this court. And I'm going to focus on what the plaintiffs posit, which is that the FTC's statement in 2008 that it never authorized Philip Morris' conduct is newly discovered evidence. That is wrong. Newly discovered evidence must reveal a fact. Newly discovered evidence has never included legal arguments, either here in Illinois or anywhere else. A fact is an objective truth that can be proven by experience or observation. For instance, a fact is whether a railroad inspected a crossing signal before an accident, like in your court decision in Lubbers. Or a fact is whether a house is in a floodplain, as in the Cipriani case that the briefs talk about. Facts also include the history of what the FTC said and did with respect to tobacco regulation. Thus, the background opinion of the Price case devotes 22 pages to exactly what the FTC said and did from 1955 to 2001. But the FTC's statements in 2008 neither dispute that history nor add to it. The 2008 statements instead make legal arguments. The FTC's lawyers used legal principles to advocate that Philip Morris' conduct was not preempted under federal law. The key to understand when the FTC used the word authorized, it used a quintessential legal term of art. Like the legal terms duty, immunity, or insanity, the term authorized means different things depending on context and the relevant law. So when the FTC discussed whether its conduct amounted to authorization, the FTC did not reveal something that the FTC observed or experienced. It's not like the FTC revealed some previously hidden agency position. So the plaintiffs invoke the FTC's intent. But notably, the FTC's brief and the precision of guidance doesn't even use or mention the word intent when it talks about the FTC. And an agency's intent is every bit as much of a legal question as legislative intent. Regardless, and Mr. Thompson talked about this, the FTC's views in 2008 do not show that Price was wrong. And I would just summarize that neither the brief nor the precision of guidance repudiates Price, doesn't criticize Price, doesn't even question Price. And it's not like your decision was a mystery. The FTC knew about it and went out of its way to distinguish it as involving a different legal question. No court, no court, much less the Supreme Court, has ever, ever overruled itself based on an agency's amicus brief or statements in the Federal Register. This court should not be the first. Now I'd like to turn to two other obstacles that prevent judgment in plaintiff's favor. That's the issues of class certification and damage. As to class certification, the $10 million class judgment includes countless, countless smokers who have no conceivable right to recover. Smokers have no claim that they were never deceived, that they would have purchased lights anyway, or if they actually received less tar and nicotine from smoking lights. But we know from plaintiff's own evidence that the class includes these people. Plaintiff's own evidence showed that what was true for one smoker was not necessarily true for another smoker. Let alone for a million smokers over 30 years. Issues such as deception, causation, and compensation are just too individualized to try some class action. And an overwhelming majority of courts have reached the same conclusion. Let's start with deception. Plaintiff's argued every smoker in America always thought the word lights meant safer. But their own internet survey showed the exact opposite. It showed 23% of smokers did not even think the word lights meant less tar and nicotine. And 32% of smokers did not think lower tar and nicotine meant lights were safer. This is devastating to the notion of universal deception. Let's turn to causation. We know smokers bought lights for reasons other than health, such as choice for peer influence. We know this from not just common sense, because the class members so testified. We also know from the price decision that the circuit court got the law wrong, because it did not apply to left-fore causation. If the smoker had other reasons for buying lights beyond health, and would have bought lights anyway, he has no claim, because the alleged deception did not cause his prejudice. Let's look at compensation. We know any smoker who didn't fully compensate got exactly what he was promised, lower tar and nicotine. But once again, common sense and the plaintiff's own group are devastating. We know that everyone smokes differently, and not all smokers fully compensate. Your own expert agreed that some people probably don't compensate fully. Dr. Benowitz and Dr. Benowitz also agreed that not all smokers compensate if they're not addicted. And we know that not all smokers are addicted. So plaintiffs are going to respond to this compensation point by arguing that lights were always more mutagenic and more toxic for everybody. That argument is wrong out of the gate, because the mutagenic claim is just out of this case. Your decision in Price held that the mutagenic claim was one of nondisclosure, and that Section 10B barred this claim. This is at page 267. Because the package of lights already contained the congressionally mandated warning, Section 10B exempted the company from not making additional disclosures. Plaintiffs don't challenge that holding, and they can't challenge that holding, because the FTC statements just have nothing to do with it. Finally, I can turn to why plaintiffs failed as a matter of law to prove any financial injury. Plaintiffs argued that they were promised, but never got, the benefit of a less dangerous cigarette. But unlike actions brought by the Attorney General, the consumer product expressly required to the private plaintiff to show actual damage. That means real, not imaginary, not hypothetical. It's not enough that someone didn't get the benefit of the bargain, or they're disappointed. Certainly, the plaintiff in Avery did not get the original General Motors parts he was promised. And he was very upset that a non-GM part was in his truck. But he had no injury and no case, because when he sold his truck, it had no effect on the price. He simply was not worse off financially. Financial loss cannot exist unless the market places a fair market value on a feature that was misrepresented. So if lights had cost a dollar more than the regular red cigarettes, plaintiffs would have suffered a financial loss of a dollar per pack. And if the price of lights had dropped a dollar after the plaintiff's allegations became known, they would have suffered an objective $1 per pack financial loss. But here we know with absolute certainty that the market placed no premium and no value on the health attributes of lights. Lights and reds always cost the same, meaning smokers paid not one penny, not one penny extra for the health attributes of lights. Your time has expired. Thank you. Thank you, Chief Justice Garmon, and may it please the Court, my name is David Frederick, and I represent the plaintiffs in this case. The appellate court properly reinstated the original judgment after granting Plaintiff's 2-1401 petition. That judgment should be affirmed, and if the court reaches the underlying merits of the appeal, Philip Morris' argument should be rejected. The critical issue here is whether the federal government ever authorized the most massive fraud in American history. And that was the fraud that Philip Morris perpetrated for decades on smokers who were led to believe that light cigarettes were safer or healthier for them. In Price 1, that issue came up at trial because Philip Morris, as part of its affirmative defense, introduced the testimony of John Peterman, who was said to be an expert about how the FTC worked. Mr. Peterman testified about the supposed facts of FTC's intent. That was a factual question as Philip Morris introduced it at trial. And as the issue came up on appeal, Chief Justice Garmon, your opinion for the plurality noted twice that intent is a fact question. Counsel, I'd like to go back to what you said earlier when you started and ask you, what authority is there, whether it's constitutional or statutory or common law, that would allow a lower court to set aside a judgment of a higher court? Well, it's not setting aside the judgment of a higher court, Chief Justice Garmon, and in fact that happened in the Close case. Because in the Close case, although it was not a decision of this court, it was a decision of the appellate court, the appellate court had reached what was deemed ultimately to be the wrong judgment based on information in the city's files about where the plaque should be drawn. And the circuit court, once that information was brought to its attention in a 214.01 petition, it changed the outcome of the case by 180 degrees. That case then went up to the appellate court, the appellate court had absolutely no problem having this be done in a 214.01 context, and it said this information altered the outcome. The purpose of 214.01, by its plain text and legislative purpose, is to achieve the right outcome in a case. Is there anything in 214.01 that would prevent that petition from being filed, for example, in the Supreme Court? Yes, I think so, because the original jurisdiction of petitions is in the circuit court. And so the timeliness argument that they advance has to be wrong for a couple of reasons. One is, Philip Morris asked the circuit court to enter final judgment. By the plain language of 214.01, the final judgment and order is that entered by the circuit court on this remand instructions from this court, which said it remanded with instructions to enter an order. By the plain terms of the statute, that was the final order. And so both for timeliness reasons and for substantive reasons, that is the final judgment. Note, the cases that talk about 214.01 as a matter of justice, Chief Justice Garmon, do so on the basis of the substance. It's not about correcting an error in opinion. It's about correcting an erroneous judgment. And that's what the circuit court was charged with doing. Because I think if we look at this just clear-eyed, there's no question that had this court known about the FDC brief and positions, it couldn't have come to the conclusion under 10b.1. Because it certainly would have discounted Mr. Peterman's testimony and said it's basically not persuasive. What's persuasive is the federal agency's opinion about whether it had ever intended to authorize light cigarette descriptors or low-tar and nicotine descriptors. And so I think if we just sort of step back and look at this from the 40,000-foot view, 214.01 is designed to achieve justice. And it has been applied that way in every one of this court's cases, regardless of the point at which the erroneous decision in the judicial process occurred, whether that was at the circuit court level or in the appellate court level. And I acknowledge that this is the first time we're aware of any situation where it was a plurality decision of this court that was later shown to be incorrect on the basis of a subsequent event. But that shouldn't matter if you take into account the plain language and purpose of the provision. Now, I'd like to... Ms. Frederick, on a follow-up to Justice Garmer's question, should this case have been filed as a motion to recall the mandate in this court? No, because it was a final judgment that had been entered at this court's instructions. That final judgment was entered at Philip Morris's urging in the circuit court by the plain language of 214.01. That was the final judgment in order in the case. And the reason why that's important is because the same term is used for normal appeals. So what Philip Morris is asking, in a number of different instances, they're asking you to create special exceptions to your normal jurisprudence for 214.01. This is one of them. They want a different rule for what constitutes a final judgment when you know from every appeal and the timeliness that's triggered for every appeal, you've got a normal rule for what constitutes a final judgment in order. And that's one that promotes administrability. And it would promote administrability in this context as well. So I'd like to turn to the question of diligence. So according to your view, a circuit court could wait years after they get the directions from this court to enter a certain kind of judgment and essentially extend the time periods for everything indefinitely. What happens to finality of judgments? Well, the finality of judgment, I think, Chief Justice Garment, is a question you don't need to decide in this case. Because if you take the year between this court's opinion and you look at what happened, there was a rehearing petition filed in this court. That was ultimately denied. There was a petition for writ of certiorari. That was denied by the Supreme Court. And literally days later, the circuit court entered, pursuant to the instructions after this court's mandate. So to the extent that you're troubled about any circuit court sitting on a mandate from this court, this is not the case on which to opine. Because there were a lot of litigation events that occurred after the Price 1 decision was entered. Now, if I could address the diligence point, it's odd to suppose that where they have the burden of proof for their affirmative defense and they introduce a witness who is deemed to be incredible by the circuit court, that we have a duty of diligence to go to a federal agency and ask for an extraordinary ask, which is them to file an amicus brief in a state Supreme Court decision. They don't cite any case in withholding that. And it would be extremely odd to suppose where only a plurality of this court came to the conclusion, based on Mr. Peterman's testimony, that that would render an action unnecessary for federal agency involvement. And certainly once the agency had acted in the other cases where Philip Morris had made this argument, we promptly came and brought this to the lower court's attention. Now, I want to point out that they offer several distinctions that are not in your cases. One is this distinction between fact versus law. This court in the People v. Lawton case, which they don't mention in their argument, completely rejected that argument. In that case, this court held that was a mixed question of fact and law, whether or not counsel had been ineffective. So there were facts about the effectiveness of the counsel that rose to a legal conclusion. Was that an ineffective assistance of counsel under the Constitution? This court said that is a perfectly good subject for a 214.01 petition. And in the Paul case, the Paul case said specifically that although a petition is ordinarily brought to bring facts, a 214.01 petition may also be used to challenge a purportedly defective judgment for legal reasons. That's at 223 Illinois 2nd at 94. The second false distinction that they ask you to draw in your cases is between facts and newly discovered evidence. But that distinction doesn't exist in your cases either and was specifically rejected in the Ostendorf case, where the court said that conditions must be satisfied for relief to be granted, notwithstanding whether the evidence was newly discovered or new evidence. And if you think about it, it's logical. Because if we were to come up with a new way to do, say, DNA testing, it would be pre-existing evidence on a crime scene, but there would be a new way in which to evaluate that evidence. But what Philip Morris is asking is for you to specially construct a Philip Morris-only exception to the normal way that 214.01 operates, and that's to re-characterize what the FTC did and said, notwithstanding the fact that any reasonable view of it is that the FTC's views would have led to a different outcome in this case. Now, I've addressed timeliness and diligence. I'd also like to speak directly to the merits of the question that the court raised and that my friend Ms. Blatt mentioned. Class certification here, the facts of them, the standard of review of those facts is whether the manifest weight of the evidence supports them. And here, they talk a lot about speculation, but they don't actually confront the evidence that was adduced at the trial. One key fact was that Philip Morris had designed its light cigarettes to trick machines under the Cambridge filter method. Another fact was that the lights and nicotine and low-tar and nicotine descriptors were false and deceptive for all customers. No one received the safer cigarette that Philip Morris promised. And so the question at this point in the trial was whether the scientific evidence showed what consequence flowed from smoking light cigarettes. And it was beyond any scientific dispute that lights are at least as dangerous as the regulars. Dr. Benowitz testified that all smokers fully compensate. Dr. Farone testified that Philip Morris had intentionally designed the cigarettes so that by the filter, every smoker would compensate by drawing deeper to achieve the level of titration, which is the chemical level in the body for getting the nicotine that was desired. And that that compensation was designed by the way they did the filters because the original form of the cigarette, the tobacco part, was exactly the same in Marlboro regulars as it was Marlboro lights. But it was through the manipulation of the design that they achieved the effect that they had. And Dr. Harris testified that the tar from Marlboro lights was more toxic. Now Philip Morris even admitted in 2002 that the lights were not actually safer. And so what happened in the Internet survey that's touted as supposedly undercutting the class certification was that that survey was done several years after the class had been certified and in fact the key depositions from the class members in the case had been done. And so it would be odd to suppose that that would overcome under the manifest way to the evidence standard, the evidence that the circuit court relied upon to determine that there were common issues of fact that did predominate. And that's the key question here. Now causation is also mentioned, but Dr. Cialdini testified that lights were generally understood to be healthier than regular cigarettes and that the health benefits were a substantial factor in virtually every class member's decision. All 23 class members who testified said that health representations caused them to smoke lights. Health, I think we could all agree, if they take judicial notice is a universal positive. You mentioned health, everybody thinks that's a good thing. And so the question about whether or not there are a few people who might be speculated to be different doesn't change the analysis of what the evidence at the trial showed, which was that smokers did not receive the promised health benefit. And how do we know that scientifically? We know that because the market share for lights went from zero to over 80% over a 30-year period. But the epidemiological evidence showed no reduction in cancer at all. And so from both a scientific perspective, the evidence at trial that was adduced demonstrated that the overriding health issue was one that everyone would have understood from these cigarettes and that was, frankly, false. Now, the question of damages has been mentioned. And again, the arguments that are advanced by Philip Morris ignore what the standard review is, which is the manifest weight of the evidence. Although the trial court's award was large, it was amply supported by the record. The test is benefit of the bargain. And they don't mention the Jarrell case, but Jarrell says you do benefit of the bargain by looking at comparative valuation. Did the person get what she bargained for when she made the purchase? It's not fair market value. It's not out-of-pocket expenses. It's about whether the value that one would ascribe to a product is the same under the conditions where there's falsity. And the issue here is obscured somewhat by a couple of facts that should not detain you but are important to acknowledge. One is Philip Morris so comprehensively distorted the market over a multi-decade period that we don't have a comparator for a safe cigarette. But Nobel Prize winning economists have told this court that that's not the question. The question is how do you get at evidence that goes to comparative value. The best evidence was the Dr. Dennis survey. And that survey actually asked light cigarette smokers what value would you ascribe to a more dangerous cigarette. And what that survey showed was that if customers knew what the truth was, they put very minimal value on knowing that a cigarette that they had been led to believe was safer was in fact not safer. And so the question, once you evaluate the damages, you're talking about purchases in this state of $7.6 or $7 billion over the period of class. And where there's no real value to having a more hazardous cigarette, it's not illogical to suppose that people ascribe very little value to that. And so I think, again, Philip Morris is asking you to change your precedent in order to benefit them by coming up with a different way of looking at benefit of the bargain damages. Again, if you look at the manifest weight of the evidence, the evidence is very clear that the damages here were substantial. And admittedly, they were large. I won't run from that. But the fraud was large. Now, the evidence that they put in at trial to counteract that was from an economist named Dr. Viscusi, who's mentioned a number of times. They seek to defend him in their brief. Dr. Viscusi concluded that the damages from this fraud were zero. So the trial court had a gap  where they showed the damages for the more dangerous cigarette to be $7.1 billion and zero. But it's important to understand in part why Dr. Viscusi came to the conclusion that he did. He came to the conclusion because he believed smoking was a net societal good economically. On cross-examination, these are his words. He said, quote, Since smokers are estimated to die sooner, they will spend less time in nursing homes and fewer will live long enough to collect their retirement pensions. As a result, smokers save society 20 cents per pack in nursing home care and a dollar in terms of lower pension and Social Security costs. On balance, smokers save society 27 cents per pack from an insurance standpoint. And that amount excludes the role of the taxes smokers pay, which average 53 cents per pack of cigarettes. He acknowledged having written those words. And when he did, I think the circuit judge quite properly viewed the contrast in evidence between what Philip Morris was advancing and what the consumers were advancing as the yardstick by which to judge damage in this case. We're now at a point where the federal government has brought a RICO fraud case against Philip Morris, which has been affirmed on appeal. The only people that have not gotten compensated are consumers. And we ask that you affirm the appellate court decision that reinstates the trial court's judgment, original judgment, so that the consumers of Illinois can finally be compensated. Thank you. Thank you, counsel. Thank you. I'm just going to start with timeliness. In terms of your question, Justice Bronson, there is nothing in the statute that tells you where you have to file a petition. So you couldn't, of course, file a petition in this court. And I noticed that the plaintiffs in the Avery decision filed a Section 1401 petition in this court. So it certainly has precedent, and there's nothing that says you can't do it. My friend, Mr. Frederick, explained it. How can you have a different rule for what's final on appeal and what's final for purposes of 21401? Well, A, the statute says so, and B, your case law uses different language. But the statute itself in 1401 says you have to run the time two years from the judgment, the judgment. And Section A of the statute tells you what the judgment is, and that's the judgment from which relief is sought. So if you're filing it two years from the judgment you're seeking relief from, nobody contends otherwise that the arguments are that the court in Christ made a mistake, not the circuit court. There's obviously good policy reasons for this, and that is any reason that you have any limitation period, a proposed finality, stability, predictability of the law, all of those policy reasons counsel for running it at the time of this court's decision. The minute you rule, it's not just law of the land for Philip Morris and the plaintiffs. It's law of the land in the entire state of Illinois. If you decide a case, it becomes precedent. And that's when parties have an understanding that the time is running. Under their view, you have a perverse incentive to always challenge the appellate's decision, even if they might not otherwise do it, because it's keeping the clock open. So you should definitely run the time that is from your decision. On justice, the last decision is Vincent, a case that obviously is very important in this court, and I think that sort of rejected this free-for-all approach that anything that justice and equity requires. And there's good reason for that, and that is, again, all the principles that underpin your decision placing limits on this. Again, predictability and finality. Wadden is a decision that we don't run from. We love Wadden. Wadden goes out of its way to say, this is not an ordinary civil case. If it was an ordinary civil case, no can do. Because the man in the case was indefinitely confined for sexually dangerous behavior, he had no way out. No way out for ineffective assistance of counsel because your statute for post-conviction didn't apply to civil proceedings. More importantly, there's no way to raise ineffective assistance of counsel on direct appeal because lawyers do not like to argue they themselves are ineffective when they appeal judgments they lost. So there was no other way. Ironically, and it's really hard not to point this out, Wadden then says, we're not going to apply the law retroactively to this case anyway. Wadden, it's not just we have no case. Your Southerland case, which we cite, Supreme Court decision, kind of makes fun of the notion of the law. It says the law in Minnesota for what's the validity of a warrant. That's partly evidence. You would be the first state, and this would be the first decision, that said legal decisions, of course, if a judgment is defective for legal reasons, that's one thing. But that can't mean because the court got the law wrong. You have a rude debate, you rule that. Because you're never going to see the end of finality. People can always second guess decisions for being wrong. Finally, again, too, on just diligence, I hasten to point out that Better Wives was a decision. They said we had no decision on diligence. That decision says you've got to at least make a phone call. We're not asking for herculean efforts here. They could have made a 60-second phone call, calling the FTC, saying, hey, I've got $10 billion on the line. Do you think we can get your help? That's not a whole lot to ask. That's all we were asking. On just the class action briefly, universal positive help doesn't do you much. The issue is in terms of why did somebody buy a cigarette, and they might have bought it for a reason other than health. Or some people might have bought a cigarette solely for the health reasons. But the question is, did all one million, every time they went to the 7-Eleven and for 30 years do it? They might have had 23 people who said, yeah, we relied on it. But that's ridiculous. And their own evidence forecloses the notion that every single person compensated the same way, had the same view, would never have bought the cigarette anyway. It just piles up and it piles up. Hasten to add, on the 80% market share, True Light has a very good market share. But that includes kids. So smoking just went up. The 80% market share includes the red cigarettes, too, because of the way the military is determining them. One more bit about damages. So they want to try and understandably talk about manifest way of the evidence. And we have arguments in our brief about why the survey was faulty for all kinds of reasons. But that's not our fundamental position. Our fundamental position is that you don't even get into calculation of damages unless you have damage. Unless under the statute you have actual damage that has to be something that's represented in the market. Price never dropped. They never showed it. There was no premium on it. Nobody paid a penny more for lights. The $7 billion figure that they came up with, to me, has a hocus pocus element, not because it's so large, but because it said each cigarette was worth $0.07 on the dollar, when nobody paid a penny more. Nobody paid a penny more. No amount of internet surveys are going to be able to produce damages where there's not any to begin with. And you think about the Avery case. They could have surveyed the internet to try to see how much the car was worth, but nobody cared because he had no fair market value loss. So Avery, and then I'm going to talk about, of course, the Mulligan versus PPC case, because that's an unbelievable decision for our side. That shopper didn't get the benefit of her bargain either. But because there was no actual loss, it just doesn't matter. And again, it's a statutory requirement that there be actual damage. The attorney general doesn't have to sue for that. And just one thing, because of the statement about the Nobel economist, no offense to people who have the Nobel Prize, but that brief is truly astonishing for the fact that it kind of misses over the whole point of this case. Nobody disputes, their whole expert, and this is on page 42 of our brief, and paragraph 84 of the Circuit Court's opinion, no one disputes that the retail price of lights are what a healthy cigarette is worth. The only thing they were trying to get at is what the real value of lights is, or what you've actually got. And that's what's the same price. Everybody's still paying the same price. And I want to get to this notion, just for common sense, is that there's this idea that this is Philip Morris's fault. This is our fault that consumers didn't suffer, because Philip Morris somehow controlled the market, because lights and breads will always cost the same. But they don't present any evidence of market manipulation, because there isn't any. There's nothing weird or sinister about the fact that lights and breads cost the same. Often in any number of industries, two products cost exactly the same, even though one of the products has a significant health feature. You can walk into any grocery store in America and see that Diet Coke and Coke cost the same, skim milk and whole milk cost the same, regular orange juice and the kind that we've added calcium for healthy bones cost the same, and it's just that the market's not putting a premium on the health attribute. And finally, I want to respond to the notion that leaving this 10-year-old decision in place means companies in Illinois can get away with fraud and scot-free. That's just not true. The plaintiffs actually showed that smokers never would have purchased lights had they known the truth. They could have shown damage. They could have shown economic loss. They just couldn't have brought a class action. That's similar to what this court said in Avery. Nor has Philip Morris turned its back on the state of Illinois. Based on a settlement agreement with the Attorney General in 1998, Philip Morris has paid this state $3 billion. Last year alone, Philip Morris paid this state $149 million, and payments under this agreement continue in perpetuity. The class-wide judgment of this case has never been about compensating the people of Illinois for any economic injury, and nothing about the passage of time justifies its resurrection. Thank you. Case number 117687, Sharon Price et al. v. Philip Morris, Incorporated, will be taken under advisement as agenda number 13. Ms. Thompson, Ms. Blatt, Mr. Frederick, thank you for your arguments this morning. You're excused at this time.